**M-10-1002**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | AFFIDAVIT IN SUPPORT OF SEARCH WARRANT |
| - against - | |
| THE PREMISES KNOWN AND DESCRIBED AS **(1)** 116 WEST SUFFOLK AVENUE, CENTRAL ISLIP, NEW YORK ("AUTO BODY SHOP"); **(2)** 100 MIDDLETON ROAD, APT #38, BOHEMIA, NEW YORK ("SANDOVAL RESIDENCE"); **(3)** 295 BERGEN AVENUE, 2nd FLOOR, WEST BABYLON, NEW YORK ("MORALES RESIDENCE"); **(4)** 16 MAPLE ROAD, AMITYVILLE, NEW YORK ("MARINE RESIDENCE") (AND ANY CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN). | (T. 21, U.S.C., §§ 846 and 841(b)(1)(A)) |

- - - - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

ILIANA PAGAN, being duly sworn, deposes and says that she is a Special Agent with Immigration and Customs Enforcement ("ICE"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that there is located at THE PREMISES KNOWN AND DESCRIBED AS **(1)** 116 WEST SUFFOLK AVENUE, CENTRAL ISLIP, NEW YORK ("AUTO BODY SHOP"); **(2)** 100 MIDDLETON ROAD, APT #38, BOHEMIA, NEW YORK ("SANDOVAL RESIDENCE"); **(3)** 295 BERGEN AVENUE, 2ND FLOOR, WEST BABYLON, NEW YORK ("MORALES RESIDENCE"); **(4)** 16 MAPLE ROAD, AMITYVILLE, NEW YORK ("MARINE RESIDENCE"); (collectively, "PREMISES"): (1) narcotics; (2) United States currency used to purchase narcotics or representing proceeds from the sale of

narcotics; (3) books, records, ledgers, papers and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics or electronic forms thereof; (4) shipping labels or other mailing documentation or materials; (5) books and records showing narcotics transactions, prices and/or quantities of narcotics purchased and/or sold; (6) books and records showing cash transactions or other evidence of narcotics trafficking, including, but not limited to, financial records, including money receipts, credit card receipts, bank records showing deposit, withdrawals and/or payments made by check or cash; (7) cellular telephones, pagers, telephone bills, pager bills and similar records; (8) papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel; (9) financial records pertaining to the proceeds of drug trafficking; all of which constitute evidence, fruits and instrumentalities of narcotics trafficking in violation of Title 21, United States Code, Sections 841(a)(1), 846 and 841(b)(1)(A))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.   I am a Special Agent with Immigration and Customs Enforcement ("ICE").  The facts set forth below are based on my

---

[1]   Because the only purpose of this affidavit is to establish probable cause to search, I have not set forth a description of all the facts and circumstances of which I am aware.

3

personal observations, conversations with other ICE agents, with detectives and officers from the Suffolk County Police Department ("SCPD"), and with other law enforcement officers, my review of reports and other documents prepared by ICE and the SCPD; reviews of telephone calls intercepted pursuant to Court-authorized wiretaps and reviews of telephone records.  I have been a special agent with ICE since February 2010.  For seven prior to that, I was an investigative assistant with the Drug Enforcement Administration ("DEA") I have participated in investigations of unlawful drug distribution and have conducted or participated in surveillance, the execution of search warrants, debriefings of witnesses, and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

2.   The facts and circumstances of this investigation have been summarized for the specific purposes of this application.  No attempt has been made to set forth the complete factual history of this investigation or all of its details.  In making this application, I am relying only on the facts stated herein.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise

indicated.   When quotation marks are used to describe the contents of intercepted calls, the quoted language is a preliminary translation of Spanish-language recordings.

### BACKGROUND

3.   Based on the evidence obtained through this investigation, a criminal complaint charging ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," a/k/a "Alexi Rodriguez," ERCILIO ANTONIO MARINE, a/k/a "Tony," ROLANDO CARMENANTE, a/k/a "Rolando Carmentate," a/k/a "Flaco,"  HUASCAR MOISES  FIGUEREO, a/k/a "Ramon LNU," a/k/a "Gordo," FAUSTO COLLADO, LUIS FELIPE ANDUJAR-RIVERA, a/k/a "Mario," FREDDY MARTINEZ, RAFAEL PEREZ, a/k/a "Gordo," AIDA SANDOVAL, a/k/a "The Girl," a/k/a "Chiquita," NATALIA AREIZA, ALEXANDER MORALES, HIPOLITO ROLDAN, a/k/a "Paulie," JOSE SANCHEZ, a/k/a "Pito," DENNY RODRIGUEZ, YUNERY MARINE, JUAN CARLOS FERRERA and ENGENIO SOLARZANO-LAMEDA, a/k/a "Cuba," the defendants, with violating Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A) was issued on or about August 27, 2010, by the Honorable James L. Cott, United States Magistrate Judge, Southern District of New York, Docket No. 10 Mag. 1894.   Sealed arrest warrants have been issued based on the Complaint.   A true and accurate copy of the sealed Complaint has been annexed hereto as Exhibit A and is incorporated by reference herein.

4.  Since in or about April 2009, ICE has been investigating an organization whose central figure is ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," a/k/a Alexi Rodriguez," the defendant, for the distribution of cocaine, marijuana, and crack in the New York City area.  ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," a/k/a Alexi Rodriguez," the defendant, receives cocaine from various suppliers, including HUASCAR MOISES FIGUEREO, a/k/a "Ramon LNU", a/k/a "El Gordo"-with the assistance of FAUSTO COLLADO and LUIS FELIPE ANDUJAR-RIVERA, a/k/a "Mario,"-FREDDY MARTINEZ, and RAFAEL PEREZ, a/k/a "Gordo", the defendants, and distributes this cocaine to a network of customers and other distributors.  AIDA SANDOVAL, a/k/a "The Girl", a/k/a "Chiquita," the defendant, is CORZO's main courier.  SANDOVAL assists CORZO in moving cocaine to other distributors and customers, including NATALIA AREIZA, ALEXANDER MORALES, HIPOLITO ROLDAN, a/k/a "Paulie," and JOSE SANCHEZ, a/k/a "Pito," the defendants, collecting the money owed for these drugs, maintaining stash houses and keeping records of drug transactions and drug debts.  As set out below, CORZO also works closely with ROLANDO CARMENANTE, a/k/a "Rolando Carmentate," a/k/a "Flaco," the defendant, who functions as a broker for CORZO, including assisting CORZO to obtain large quantities of cocaine.  Further, as set out below, CORZO works closely with ERCILIO ANTONIO MARINE, a/k/a "Tony," the defendant.

6

MARINE and CORZO supply each other cocaine that they then distribute to their respective customers and distributors. MARINE distributes cocaine through his couriers, DENNY RODRIGUEZ and YUNERY MARINE, the defendants. Further, CORZO is also involved in the distribution of marijuana, which he receives from JUAN CARLOS FERRERA through EUGENIO SOLARZANO-LAMEDA, a/k/a "Cuba," and from CARMENANTE, the defendants, among others. Moreover, the cocaine that CORZO supplies to MORALES and AREIZA appears to be converted into crack cocaine on various occasions by these two individuals and based on conversations with CORZO regarding "cooking" the cocaine, CORZO knows that is the case. See Ex. A. ¶¶ 8, 10.

5. In the course of the investigation, ICE obtained judicial authorization to intercept communications occurring over three telephones, including a cellular phone used by ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," a/k/a Alexi Rodriguez" (the "Corzo Cell Phone"). See Ex. A ¶ 20. The substance of certain of these communications intercepted over those telephones will be described in this Affidavit.

## THE PREMISES

### APPLICATION FOR SEARCH WARRANTS

6. Based upon the information set forth below, my training, experience, and participation in this and other narcotics investigations, and my conversations with other law

enforcement officers, there is probable cause to believe that the PREMISES are either (1) the residence of a member of the conspiracy used to store narcotics, proceeds of narcotics trafficking, and other items related to the crimes charged in the Complaint; or (2) in the instance of the AUTO BODY SHOP, a business owned by ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," a/k/a Alexi Rodriguez," the defendant, used to store narcotics and other items related to the crimes charged in the Complaint. As set forth in detail below, each of the PREMISES was used for the purpose of transacting narcotics deals. The probable cause for each of the PREMISES is set forth below.

<u>116 WEST SUFFOLK AVENUE, CENTRAL ISLIP, NEW YORK</u>

(the "AUTO BODY SHOP")

7.     Based on agents' observations and other sources of information detailed herein, the AUTO BODY SHOP is located at 116 West Suffolk Avenue, Central Islip, New York, on the South Side of West Suffolk Avenue. The AUTO BODY SHOP is a one-story commercial "A-frame," building with tan and yellow walls and a gray roof. The front of the building has two garage door bays of equal size. Another garage bay door is located on the West side of the building. Hanging above the front garage doors is a white, blue and red sign that and reads "Eagle Auto." In front of the building, there is a free-standing white, blue and red sign, on top of a pole, that reads "Eagle." The AUTO BODY SHOP

- 7 -

has a blacktop driveway in front of the building and a fenced in side/back area for additional parking. A black chain link fence with a gate runs along the West side of the building, and a silver chain link fence with a gate runs along the East side of the building.

8. I believe, from my review of conversations on the Court-authorized wiretaps and surveillance done as part of this investigation, that ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," a/k/a "Alexi Rodriguez," the defendant, and others use the AUTO BODY SHOP as a location to store narcotics and to conduct narcotics transactions. Specifically, as set forth in the Complaint:

a. On or about May 14, 2010, CORZO made arrangements with EUGENIO SOLARZANO-LAMEDA, a/k/a "Cuba," for the delivery of five or six pounds of marijuana. Later that day, law enforcement officers observed a green Ford Explorer depart SOLARZANO-LAMEDA's house. Three minutes later, SOLARZANO-LAMEDA left his house and drove away in his black Lincoln Towncar. At approximately 3:48 p.m., SOLARZANO-LAMEDA called CORZO as he approached the AUTO BODY SHOP. During that call, CORZO advised SOLARZANO-LAMEDA to come to the AUTO BODY SHOP discreetly because there were people watching. The surveillance team observed SOLARZANO-LAMEDA arrive at the AUTO BODY SHOP, get out of his car, open the trunk, and hide a white bag in the hollow part of

- 8 -

the spare tire, under some papers. SOLARZANO-LAMEDA then carried that tire into the shop. <u>See</u> Ex. A ¶ 24.f.

   b. On or about June 3, 2010, June 4, 2010, and June 5, 2010, law enforcement intercepted multiple calls during which CORZO made arrangements with HUASCAR FIGUEREO, a/k/a "Ramon LNU," a/k/a "El Gordo," the defenant, for FAUSTO COLLADO, the defendant, to deliver cocaine to CORZO. <u>See</u> Ex. A ¶ 21.c.

   c. On or about June 5, 2010, another law enforcement officer observed COLLADO enter and the AUTO BODY SHOP at the same time there are calls between CORZO and COLLADO on the Corzo Cell Phone, which reflect, in substance and in part and based on my training and experience and knowledge of this investigation, CORZO directing an individual not named in this Complaint to get money from a hidden location the AUTO BODY SHOP to give to COLLADO as a payment for the drugs. <u>See</u> Ex. A ¶ 21.d.

   d. On June 9, 2010, at approximately 6:20 p.m., CORZO asked FIGUEREO, in sum and substance, to deliver two kilograms of cocaine. FIGUEREO agreed to send a courier to the AUTO BODY SHOP on Friday morning. <u>See</u> Ex. A ¶ 21.e-f.

   e. On June 11, 2010, a Friday, at approximately 8:45 a.m., other law enforcement officers observed COLLADO entering the AUTO BODY SHOP, carrying what appeared to be a briefcase. A blue, Honda Civic (the "Honda"), which a record check revealed was registered to COLLADO, was also observed

- 9 -

g.   On July 8, 2010, at approximately 2:02 p.m.,
other law enforcement agents observed LUIS FELIPE ANDUJAR-RIVERA,
a/k/a "Mario," arrive at the AUTO BODY SHOP.  CORZO approached
ANDUJAR-RIVERA, who got out of his car with what appeared to be a
bag over his shoulder.  CORZO and ANDUJAR-RIVERA then walk
together to the back of the AUTO BODY SHOP.  Approximately ten
minutes later, other law enforcement agents observed
ANDUJAR-RIVERA leave the AUTO BODY SHOP and depart the location.
At approximately 3:08 p.m. that day, CORZO called FIGUEREO and
said "that guy came and left already."  CORZO complained that the
cocaine delivered by ANDUJAR-RIVERA was of poor quality and that
part of his order was missing.  See Ex. A ¶ 21.1-n.

9.   On or about August 30, 2010, another law
enforcement officer observed CORZO at the AUTO BODY SHOP.

## 100 MIDDLETON ROAD, APARTMENT #38, BOHEMIA, NEW YORK

## ("SANDOVAL RESIDENCE")

10.   Based on agents' observations and other sources of
information detailed herein, the SANDOVAL RESIDENCE is located at
100 Middleton Road, Apartment 38, Bohemia, New York.  The
SANDOVAL RESIDENCE is a one-bedroom apartment located in an
apartment complex managed by Fairfield Properties (the "Fairfield
Apartments").  Within the Fairfield Apartments, Middleton Road
runs south from Westgate Drive to Sussex Place.  The building
located at 100 Middleton Road is two stories, with a brick facade

along the first floor and a tan siding on the second floor.  A
sign on the building states, "100 Middleton Road."  Apartment #38
is located on the east side of the building.  The number "38" in
white numbers appears on the front door to the SANDOVAL
RESIDENCE.

        11.  I believe, from my review of conversations on the
Court-authorized wiretaps and surveillance done by law
enforcement as part of this investigation, that AIDA SANDOVAL,
a/k/a "The Girl", a/k/a "Chiquita," lives at the SANDOVAL
RESIDENCE, and that ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU,"
a/k/a "Alex Rodriguez," and SANDOVAL store narcotics at the
SANDOVAL RESIDENCE.  For example:

        a.  On or about March 17, 2010, at approximately
4:45 p.m., agents intercepted a call on the Corzo Cell Phone
between CORZO and NATALIA AREIZA on AREIZA's cell phone.  During
this conversation, AREIZA stated, "Can you give me a discount?
Give me some love; don't be so tough."  CORZO responded, "How
many is it going to be?"  AREIZA responded, "The same as last
time."  CORZO replied, "250, right?", to which AREIZA responded,
"Uh-huh."  CORZO then said, "Take away 100 pesos."  AREIZA then
said, in substance and in part, that she wanted to meet with
CORZO the following day.  AREIZA then asked, "But it is good,
right?"  CORZO responded, "Yes, really good."  Based on my
training and experience and knowledge of the investigation, I

- 12 -

believe that during this call, AREIZA called CORZO to ask for a discount on 250 grams of cocaine that CORZO was selling to her the next day. CORZO took $100 off the purchase price. AREIZA further inquired into the quality of the cocaine ("But it is good, right?") and CORZO assured her that the quality was high ("Yes, really good."). See Ex. A ¶ 27a.

       b.  ·At approximately 4:49 p.m. the same day, agents intercepted a call on the Corzo Cell Phone between CORZO and SANDOVAL. During this conversation, CORZO stated, "Okay, I am busy. I am going to the city to get some money. Later on when I get there . . . how much is left? Tomorrow I have 250 sold for Natalia and 200 sold for a guy. There were 500 there." SANDOVAL responded, "There are three bags, but I don't know how much there is. When I get back I will count it." CORZO replied, "Do one for 200, the other 250. Have it separate. I will call you later." Based on my training and experience and knowledge of the investigation, I believe that during this call, CORZO called SANDOVAL to tell her to prepare the 250 grams of cocaine that CORZO has sold to AREIZA and 200 grams CORZO has sold to another unknown individual. See Ex. A ¶ 27b.

       c.  On or about March 18, 2010, at approximately 10:18 a.m., agents observed SANDOVAL departing the SANDOVAL RESIDENCE in a gray Dodge Durango. See Ex. A ¶ 27c.

d.    At approximately 10:33 a.m. the same day, agents intercepted a call on the Corzo Cell Phone between CORZO and AREIZA. During that call, in sum and substance, CORZO told AREIZA that SANDOVAL was on her way to meet AREIZA. At approximately 10:35 a.m., agents witnessed SANDOVAL arrive at the AUTOBODY SHOP. At approximately 10:45 a.m. on March 18, 2010, agents witnessed SANDOVAL arrive at a residence on 97 Vanderbilt Street, Brentwood, New York. An unknown female, believed to be AREIZA, exited the residence carrying a small bag. Agents witnessed AREIZA reach into SANDOVAL's vehicle with the same hand holding the bag. When AREIZA returned to the residence, she appeared to be carrying a different unknown item in her hand. See Ex. A ¶ 27d.

e.    On or about April 18, 2010, at approximately 1:51 p.m., CORZO called SANDOVAL on the Corzo Cell Phone. During that conversation, CORZO stated, "Did you leave already?" SANDOVAL replied, "Yes." CORZO asked, "What are you taking? Tell me." SANDOVAL responded, "150 for Natalia and 50 for Alex." CORZO asked, "How does it look, nice?" SANDOVAL replied, "Yes, it is beautiful." Based on my training and experience and knowledge of the investigation, I believe that during this call, CORZO and SANDOVAL were discussing how much cocaine they were going to provide to NATALIA AREIZA and MORALES, who SANDOVAL refers to as "Alex". SANDOVAL told CORZO that she was going to

provide "150" grams to AREIZA and "50" grams to MORALES.
SANDOVAL then advised CORZO that what is likely cocaine is
"beautiful," meaning that the cocaine is of good quality. See Ex.
A ¶ 22c.

       f.   On or about April 30, 2010, at approximately
6:29 p.m., ALEXANDER MORALES and CORZO spoke on the Corzo Cell
Phone.  During this call, MORALES told CORZO, "I need [some] for
[an unknown individual]."  CORZO asked, "How much?" to which
MORALES replied, "7-5."  CORZO then told Morales, "Let me call
her and I'll call you back."  At approximately 6:30 p.m., MORALES
and CORZO spoke again on the Corzo Cell Phone.  CORZO asked
MORALES, "Should she go to your house?"  MORALES replied, "Yes,
I'm here."  Based on my training and experience and knowledge of
the investigation, I believe that this call concerns a sale of
cocaine to MORALES, that the female referenced on the call is
SANDOVAL, and the "house" reference is 295 Bergen Avenue.  See
Ex. A ¶ 22d.

       g.   At approximately 7:19 p.m. on April 30, 2010,
other law enforcement observed SANDOVAL departing from 100
Middleton Road driving a silver Chrysler Town & Country,
registered to the address of the AUTO BODY SHOP.  At
approximately 7:52 p.m., SANDOVAL arrived at the MORALES
RESIDENCE.  SANDOVAL was observed walking around the back of 295

Bergen Avenue, and up to the door of the MORALES RESIDENCE, which is accessed from the deck. See Ex. A ¶ 22e.

h.    On or about May 6, 2010, at approximately 11:05 a.m., agents intercepted a call on the Corzo Cell Phone between CORZO and HIPOLITO ROLDAN, a/k/a "Paulie," during which ROLDAN said that he "ha[d] to go to exit 40", by which I believe, based on my training and experience and my participation in the investigation, ROLDAN meant he wanted 40 grams of cocaine. At approximately 11:07 a.m., CORZO called SANDOVAL from the Corzo Cell Phone, and told SANDOVAL, "[t]here's 40 left for Paulie", and instructed SANDOVAL to call "Paulie." At approximately 11:59 a.m., agents conducting surveillance observed SANDOVAL drive away from the SANDOVAL RESIDENCE. At approximately 12:10 p.m., agents observed SANDOVAL arrive at a Lowe's Home Improvement Store parking lot in Bay Shore, New York. At 12:15 p.m., agents observed SANDOVAL park in the lot, and at 12:20 p.m., agents observed ROLDAN get into SANDOVAL's vehicle. After driving around the parking lot, SANDOVAL dropped ROLDAN next to his vehicle a few minutes later. See Ex. A ¶ 29d.

i.    On or about May 11, 2010, at approximately 6:26 p.m., SANDOVAL called CORZO on the Corzo Cell Phone. During that conversation, SANDOVAL stated, "It is completed . . . it is completed . . . I feel kind of bad." CORZO responded, "Really?" SANDOVAL stated, "Yes . . . Because of the powder . . . Even

though I used a rag, and it is the same." CORZO said, "So it is good." SANDOVAL replied, "Yes. It is strong." CORZO asked, "Really?" to which SANDOVAL responded in the affirmative. CORZO then said, "Good! I like that . . . have a glass of milk . . ." SANDOVAL stated, "I already did that . . . So who do I have to . . ." CORZO stated, "You have to take 50 to [a co-conspirator not named in the Complaint], 100 to Alex M. and bring me 20." SANDOVAL stated, "So it is 100 . . . let me write that down . . ." Based on my training and experience and knowledge of the investigation, I believe that during this call, SANDOVAL is telling CORZO that she had finished processing good quality cocaine. I also believe that SANDOVAL who, the investigation revealed was pregnant at the time, is telling CORZO that the powder from the cocaine made her feel sick ("I feel kind of bad") even though she covered her face ("Because of the powder . . . even though I used a rag"). In addition, I believe that CORZO is telling SANDOVAL to bring 100 grams of cocaine to MORALES ("Alex M.") and 20 grams to him. See Ex. A ¶ 22h.

j.  On or about May 28, 2010, at approximately 11:23 p.m., SANDOVAL called CORZO on the Corzo Cell Phone. During their conversation, CORZO asked, "Are you still doing the numbers?" SANDOVAL responded, "Yes . . . doing the math. I'm seeing that I had to take from the old 3500 with the check that Sergio gave and I have 600 more . . ." CORZO stated, "I don't

think you write things down accurately Chiquita." SANDOVAL replied, "But it's the same thing, I have only 600 dollars more . . . that's too little, right?" CORZO said, "Of course because you have to add everything right and you'll see . . . it has to come out . . . too little 2000 or 3000 it's too little." SANDOVAL said, "Those two were at 38 . . ." CORZO responded, "So it came out more than 4000, imagine." SANDOVAL stated, "Yes, 4000 yeah." Based on my training and experience and knowledge of the investigation, I believe that SANDOVAL and CORZO were discussing SANDOVAL's accounting of the cocaine proceeds, and CORZO thought that she was not calculating the proceeds correctly. See Ex. A ¶ 22i.

k.     On June 18, 2010, at approximately 6:12 p.m., CORZO called SANDOVAL using the Corzo Cell Phone. During the call, CORZO said, "Indio called me, give him a call." SANDOVAL responded, "I told him, I kept on charging him. He said enough, since he said that I did not have to keep charging him in order to buy. So he told me, that he will give it to me until there is left. What happens is . . ." CORZO interrupted, saying, "What do you mean, until there is any?" SANDOVAL responded, "The other 500 that he owes and he said that it was for his friend and he has not paid the 500." CORZO said, "You know what you and me talked. To take it to his friend's you know that I charge him more and that's how we get the money. You only have to tell him,

- 18 -

'look you have to pay me what you owe.' I am going to tell him right now." Based on my training and experience and knowledge of this investigation, I believe that CORZO and SANDOVAL are discussing the difficulties they have encountered getting a co-conspirator not named in the Complaint, "Indio," to pay for the narcotics they have sold to him in the past.

1.   At approximately 6:13 p.m., CORZO called Indio using the Corzo Cell Phone. During the conversation, CORZO stated, "Look, try to send me the old . . . not the old, old one . . . the 500 you owe me." Indio responded, "No, I'll send you something . . . tell her to come." CORZO said, "Of course . . . you are a bit late." Indio replied, "Because she told me she doesn't have money . . ." CORZO stated, "No but imagine, you know well enough . . ." Indio said, "Okay but tell her to come and I'll give her some of what I have . . . because is that I don't have . . ." CORZO stated, "No, it's fine . . . she goes . . . pay her the other stuff." Indio asked, "What time is she coming?" CORZO replied, "She'll call you now."

m.   At approximately 6:35 p.m., SANDOVAL called CORZO on the Corzo Cell Phone. During the conversation, SANDOVAL stated that she was going to see "Indio".

n.   At approximately 6:45 p.m., agents began surveilling 100 Middleton Road. At approximately 7:05 p.m., agents observed SANDOVAL depart the location in a Dodge Dakota.

At approximately 7:31 p.m., agents observed SANDOVAL arrive at the Lowe's Home Improvement Store on Route 112 in Medford, New York and pull up next to a parked Ford E350. Agents witnessed an individual they identified as Indio open the driver's side door of the Ford and lean into the driver's side window of the Dodge Dakota. Moments later, agents observed Indio return to the Ford and leave the parking lot. Shortly thereafter, SANDOVAL also left the parking lot.

o.    On or about August 23, 2010, at approximately 5:28 p.m., CORZO spoke to SANDOVAL on the Corzo Cell Phone. During this call, CORZO said, "Ugly, where do you keep the money?" SANDOVAL responded, "When you get in there, above to your left . . . just stick your hand in there." CORZO replied, "Up there where the pants are?" SANDOVAL answered, "Yeah" and later, "[ ] when you get in, towards the left just stick your hand in and it's underneath some things." CORZO replied, "Okay, got it . . . and everything is on two's, right? Because I will have to pull some from here . . . I just need 3-3." Based on my training and experience and knowledge of this investigation, I believe that during this call, CORZO is in the SANDOVAL RESIDENCE looking for money that SANDOVAL had hidden.

12.    In approximately the beginning of August 2010, another law enforcement officer received tenant records provided by the property management company for the SANDOVAL RESIDENCE.

- 20 -

Based upon a review of these records, law enforcement learned, in substance and in part, that AIDA SANDOVAL, a/k/a "The Girl", a/k/a "Chiquita," is listed as the tenant of the SANDOVAL RESIDENCE.

13. On or about August 30, 2010, another law enforcement officer observed CORZO exiting the front door of the SANDOVAL RESIDENCE.

### 295 BERGEN AVENUE, 2nd FLOOR, WEST BABYLON, NEW YORK

### ("MORALES RESIDENCE")

14. Based on agents' observations and other sources of information detailed herein, the MORALES RESIDENCE is located at 295 Bergen Avenue, 2ND Floor, West Babylon, New York. 295 Bergen Avenue is a two-story, stand-alone house with light-blue vinyl siding, white-trim, and a brown front door. It is located across the street from the Bergen Point County Gold Course. To the south of the 295 Bergen Avenue on Bergen Avenue is Frank's Dockside Café. A garage, which has been converted to a studio apartment, is attached to the side of the house. Above the garage, is a wooden deck that leads to a door with an entrance to the second floor of the residence. The stairs to the wooden deck begin at the back of the south side of the house. Below the deck on the south side of 295 Bergen Avenue is the entrance to the studio apartment in the garage.

15. I have learned from a confidential informant ("CI-1")[2] that CORZO owns 295 Bergen Avenue and that ALEXANDER MORALES lives at 295 Bergen Avenue, West Babylon, New York ("295 Bergen Avenue"). I also believe, from my review of conversations on the Court-authorized wiretaps and surveillance done by law enforcement as part of this investigation, that MORALES lives at the MORALES RESIDENCE, and that MORALES stores narcotics at and conducts narcotics transactions with AIDA SANDOVAL, a/k/a "The Girl," a/k/a "Chiquita," at the MORALES RESIDENCE. For example:

a. On or about March 9, 2010, at approximately 8:42 p.m., MORALES and ANDRES MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," spoke on the Corzo Cell Phone. During this call, MORALES asked CORZO if he had anything "good"? CORZO responded, "Expensive, I told your brother [likely a reference to co-conspirator not charged herein], it's expensive." MORALES replied, "but is it good?" CORZO answered, "I can take something to you for tomorrow, so you can cook about ten." MORALES replied, "No, no, I need one." CORZO and MORALES then discussed the timing of the delivery. CORZO asked, "What happened with that guy?" And MORALES replied, "Nothing, I don't know, they are still looking for something . ." CORZO later responded,

---

[2] The information provided by CI-1 has proven reliable and credible and has been corroborated both by criminal history checks, surveillance, and recorded telephone conversations. CI-1 has been paid for the information s/he has provided to ICE regarding CORZO and others.

"Everybody is adding [] to that shit. The other day they brought me some shit at about 32. I returned it to him." MORALES later added that he was looking for "about ten," and CORZO told him that it would have to be for tomorrow and that he would bring "those ten" tomorrow when CORZO sees MORALES about the "rent. The two of them then discussed how a co-conspirator not charged herein is looking for something under "32." Based on my training and experience and knowledge of this investigation, I believe that during this call, MORALES is looking for good cocaine from CORZO. I believe that CORZO is telling MORALES that he had ten grams that were good for making into crack, i.e., "cook[ing]." Later in the conversation, I believe CORZO and MORALES are complaining about the quality of cocaine available. I also believe that the reference to "32" is a reference to price per gram of cocaine. Finally, based on my training and experience and knowledge of this investigation, I believe that the reference to "rent" is a reference to the actual rent that MORALES owes CORZO for living at the MORALES RESIDENCE. See Ex. A ¶ 22b.

b.   On or about March 11, 2010, at approximately 2:19 p.m., SANDOVAL was captured on video surveillance arriving at 295 Bergen Avenue, walking up the staircase leading to the deck and entrance to the MORALES RESIDENCE, and entering the MORALES RESIDENCE. At approximately 2:26 p.m., SANDOVAL was captured on video surveillance exiting the MORALES RESIDENCE and

driving away. At approximately 2:26 p.m., MORALES spoke to CORZO on the Corzo Cell Phone. During this call, CORZO told MORALES that "she is there," to which MORALES responded, "I just went out." CORZO then replied, "Is your girlfriend there?" And MORALES responded, "She is there. The door is open, tell her to go in, and to leave it on the couch, on top of the microwave." CORZO replied, "Isn't your girlfriend there?" MORALES answered, "Yeah, maybe she's in the bathroom . . . But I left the door open, tell her to leave it on top of the microwave." Based on my training and experience and knowledge of this investigation, I believe that MORALES is telling CORZO to have SANDOVAL leave the cocaine for him on top of the microwave in the MORALES RESIDENCE.

     c. At approximately 2:26 p.m. on March 11, 2010, CORZO spoke to SANDOVAL on the Corzo Cell Phone. During this call, CORZO told Sandoval, "Chiquita, his door is open, and his girlfriend is there, he says just put it on top of the microwave." SANDOVAL replied, "Yes, I saw her already, and she told me that he didn't leave the money." At approximately 5:01 p.m., SANDOVAL and CORZO spoke again on the CORZO Cell Phone. During this call, CORZO told SANDOVAL that he was going to ask MORALES "to leave the money there from what you brought him." SANDOVAL replied, "Okay," and CORZO asked, "how long?" SANDOVAL replied, ". . . about 40 minutes." At approximately, 6:06 p.m., SANDOVAL was captured on video surveillance arriving at 295

Bergen, walking up the staircase leading to the MORALES
RESIDENCE, and entering the MORALES RESIDENCE. At approximately
6:09 p.m., SANDOVAL is observed on video leaving the MORALES
RESIDENCE, walking down the staircase, and driving away.

   d.  On or about April 30, 2010, at approximately
6:29 p.m., MORALES and CORZO spoke on the Corzo Cell Phone.
During this call, MORALES told CORZO, "I need [some] for [an
unknown individual]." CORZO asked, "How much?" to which MORALES
replied, "7-5." CORZO then told Morales, "Let me call her and
I'll call you back." At approximately 6:30 p.m., MORALES and
CORZO spoke again on the Corzo Cell Phone. CORZO asked MORALES,
"Should she go to your house?" MORALES replied, "Yes, I'm here."
Based on my training and experience and knowledge of the
investigation, I believe that this call concerns a sale of
cocaine to MORALES, that the female referenced on the call is
SANDOVAL, and the "house" reference is 295 Bergen Avenue. See
Ex. A ¶ 22d.

   e.  At approximately 7:19 p.m. on April 30, 2010,
other law enforcement observed SANDOVAL the SANDOVAL RESIDENCE
driving a silver Chrysler Town & Country, registered to the
address of the AUTO BODY SHOP. SANDOVAL drove directly to the
MORALES RESIDENCE and at approximately 7:52 p.m., she arrived at
the MORALES RESIDENCE. SANDOVAL was observed walking around the
back of 295 Bergen Avenue, and up to the door of the MORALES

RESIDENCE, which is accessed from the deck. See Ex. A ¶ 22e. In addition, at this same approximate time, law enforcement observed a black, Nissan Frontera (the "Nissan Frontera") - registered to "Daniel Morales," an individual who is believed to be MORALES's brother - parked in the driveway of 295 Bergen Avenue. At approximately 7:57 p.m., SANDOVAL was observed departing the MORALES RESIDENCE.

                f.    On or about May 7, 2010, at approximately 8:44 p.m., MORALES and CORZO spoke on the Corzo Cell Phone. MORALES asked CORZO in substance and in part where CORZO was and whether CORZO wanted to pick up what MORALES owed CORZO. MORALES also asked if CORZO could "leave [him] another one." At approximately 8:45 p.m. on May 7, 2010, CORZO and SANDOVAL spoke on the Corzo Cell Phone. During this call, based on my training and experience and knowledge of the investigation, I believe that CORZO directed SANDOVAL in substance and in part to deliver 20 grams of cocaine to MORALES and to collect $2,300 from MORALES. At approximately 8:53 p.m. on May 7, 2010, MORALES and CORZO spoke again. CORZO told MORALES, in sum and substance, that SANDOVAL was "going to bring you just 20 . . . I think tomorrow I am going to get more . . . The thing is the prices." MORALES replied, "Okay . . . just give what you want . . . I left that to my girlfriend, I am not going to be there." MORALES replied that he will call another guy and he will "definitely be able to do

something." Based on my training and experience and knowledge of the investigation, I understand that in the first part of this conversation CORZO and MORALES are discussing the delivery by SANDOVAL of 20 grams of cocaine to MORALES. See Ex. A ¶ 22f.

g. At approximately 9:20 p.m. on May 7, 2010, law enforcement observed a Hispanic male believed to be MORALES leave 295 Bergen Avenue operating the Nissan Frontera. Other law enforcement officers have observed MORALES using the Nissan Frontera on various occasions. At approximately 9:28 p.m., the same Hispanic male, believed to be MORALES returned to 295 Bergen Avenue in the same pick-up truck. At approximately, 9:35 p.m., SANDOVAL was observed arriving at 295 Bergen Avenue driving a green minivan, registered to the address of the AUTO BODY SHOP. SANDOVAL was observed carrying a small bag, walking to the back of 295 Bergen Avenue, and walking up the stairs leading to the MORALES RESIDENCE. At approximately 9:42 p.m., SANDOVAL was observed leaving 295 Bergen Avenue. See Ex. A ¶ 22g.

h. On or about July 24, 2010, at approximately 10:02 a.m., CORZO spoke with MORALES on the Corzo Cell Phone. During this call, in substance and in part, MORALES told CORZO that, "I almost have everything and . . . I have more for the car." CORZO replied, ". . . . because I'm almost empty . . . I have there . . . let's say like a six." MORALES replied, "Okay, so bring me four for the 'Tapo.'" CORZO responded, "Oh, four

zero, right?" MORALES replied, "Yeah. I have it over here."
Based on my training and experience and knowledge of this
investigation, I believe that MORALES and CORZO are discussing a
cocaine transaction involving approximately 40 grams.

i. On or about July 29, 2010, at approximately
7:00 p.m., other law enforcement officers observed a Hispanic
male believed to be MORALES get into the Nissan Frontera that was
parked at the MORALES RESIDENCE. At 7:05 p.m., law enforcement
pulled over the Nissan Frontera for a traffic violation relating
to the tint of the vehicle's windows, and the Hispanic male
driver provided a New York State driver's license with the name
"Alexander Morales." The Hispanic male driver, who matched the
physical description of the individual observed at the MORALES
RESIDENCE on or about May 7, 2010, stated in substance and in
part that he was in the vicinity in order to visit his mother at
295 Bergen Avenue, but that he lived elsewhere. On or about
August 3, 2010, at approximately 4:12 p.m., CORZO spoke to an
individual not charged in the Complaint on the Corzo Cell Phone,
during which call I believe, based on my training and experience
and knowledge of the investigation, that CORZO discussed the fact
that MORALES had been pulled over "the other day" by law
enforcement for having tinted windows. See Ex. A ¶ 22k.

## 19 MAPLE ROAD, AMITYVILLE, NEW YORK

### (the "MARINE RESIDENCE")

16.  Based on agents' observations and other sources of
information detailed herein, the MARINE RESIDENCE is located at
19 Maple Road, Amityville, New York.  The MARINE RESIDENCE is a
two-story house with light blue/gray vinyl siding, and driveways
on both sides of the house.  The front door is white with four,
gray brick steps and white railings leading up to the door.  A
white vinyl fence runs along both sides of the MARINE RESIDENCE
and encloses the backyard.  A satellite dish sits on the right
side of the roof.  Behind the white vinyl fence is an entrance to
the lower level basement.  In the back of the house there is a
rear entrance to the ground floor of the MARINE RESIDENCE.

17.  I believe, from my review of conversations on the
Court-authorized wiretaps and surveillance done as part of this
investigation, that ERCILIO ANTONIO MARINE, a/k/a "Tony," DENNY
RODRIGUEZ, YUNERY MARINE, the defendants, and others use the
MARINE RESIDENCE as a location to store narcotics and to conduct
narcotics transactions.  For example:

a.  On or about March 19, 2010, ANDRES
MARROQUIN-CORZO, a/k/a "Alex LNU," a/k/a "Alex Rodriguez," and
MARINE spoke on the phone, using coded language, about cocaine
that MARINE had in his possession and that CORZO was interested
in purchasing.  MARINE told CORZO that he could come to the

- 29 -

MARINE RESIDENCE to view the cocaine.  At approximately 6:55
p.m., CORZO called MARINE to inform MARINE that he had arrived at
the MARINE RESIDENCE.  Agents conducting surveillance at the
MARINE RESIDENCE observed MARINE arrive at the MARINE residence
at approximately 5:42 p.m.  At approximately 6:55 p.m., agents
observed CORZO arrive at the MARINE RESIDENCE.  CORZO retrieved a
bag from the backseat before he entered the MARINE RESIDENCE.  At
approximately 7:01 p.m., agents observed CORZO exit the residence
through the front door with a bag.  CORZO put the bag in the rear
of the car before getting in the car and driving away from the
residence.  On the same day, at approximately 7:15 p.m., Corzo
called Sandoval and said, "I'm going to go by and get what you
brought to me, because what the guy had was garbage."  Based on
my training and experience and knowledge of the investigation, I
believe that in this conversation, CORZO told SANDOVAL that he
saw the narcotics MARINE had available, but was not satisfied
with the quality of the narcotics.  See Ex. A ¶ 26.a-b.

          b.    On or about May 11, 2010, CORZO and MARINE
spoke by phone.  During the conversation, CORZO asked if "it" was
there.  MARINE said that it was, and that it was "pretty."  CORZO
then indicated that he would come to MARINE.  I believe, based on
my training and experience, that during this call, CORZO and
MARINE were discussing cocaine (which MARINE considered to be
high-quality) that MARINE had in his possession.  At

approximately 3:15 p.m. on the same day, CORZO called MARINE to ask MARINE whether he was at his house, to which MARINE responded, "I'll be there in two minutes.  I'm on my way." Agents conducting surveillance at the MARINE RESIDENCE observed CORZO arrive at the MARINE RESIDENCE at approximately 3:20 p.m. Agents then observed MARINE arrive at the MARINE RESIDENCE at approximately 3:25 p.m.  Agents observed MARINE and CORZO greet each other outside the MARINE RESIDENCE before entering.  A few minutes later, agents observed MARINE and CORZO exit the MARINE RESIDENCE and walk to CORZO's vehicle. Agents then observed CORZO open the driver's side door, rear door and trunk, and then lean in the rear door.  MARINE retrieved a large pink shopping bag from the trunk of the vehicle.  MARINE then reentered the residence while CORZO got in his Honda Accord and drove away. Based on my training and experience and knowledge of the investigation, I believe that the meeting between CORZO and MARINE at the MARINE RESIDENCE was for the purpose of providing an opportunity to CORZO to view MARINE's cocaine.  See Ex. A ¶ 26.c-d.

      c.   On or about June 4, 2010, at approximately 10:17 a.m., CORZO and MARINE spoke by telephone.  During the conversation, MARINE indicated that he was on his way to Brentwood.  MARINE then told CORZO, "Leave it there in the little house in the back," and then instructed, "Put inside the little

house, where the beers are . . . the little house closed in the
back." CORZO said, "Shit! I would like you to try to come back
fast, so you . . . don't lose that!" MARINE told CORZO, "Don't
worry, no one is there . . . Nobody is in my house at this time."
MARINE then said, "Nobody is there. Leave that there in the
little house. Had always done that, and had never had
problems." Based on my training and experience, and my
participation in this investigation, I believe that during this
conversation, MARINE is directing CORZO to leave cocaine in a
little house behind the MARINE RESIDENCE. CORZO expressed
concern over leaving the cocaine in the little house but MARINE
told CORZO not to worry. At approximately 10:22 a.m., CORZO and
MARINE again spoke on the telephone. During that conversation,
MARINE told CORZO that he can leave "it" in the garbage can if he
wanted to . CORZO said, "I think that's better." Based on my
training and experience, and my participation in this
investigation, I believe that during this conversation, MARINE
told CORZO to leave the cocaine inside a garbage can at the rear
of the MARINE RESIDENCE. At approximately 10:24 a.m., MARINE and
CORZO again spoke by telephone. CORZO told MARINE, "I just left,
and the guy from across the street was there . . . you know the
'policeman'. . . . He was looking at me . . . like, 'Who's this
one?" At approximately 10:34 a.m., CORZO and MARINE again talked
by telephone. During this call, MARINE told CORZO not to worry,

- 32 -

and that if MARINE's neighbor asked MARINE about CORZO, MARINE
would tell the neighbor that CORZO was returning the drill that
CORZO borrowed from MARINE.   CORZO replied, "Yeah, something like
that.   But try to go to your house and don't screw around."
Based on my training and experience, and my participation in this
investigation, I believe that in these calls, CORZO is expressing
concern that one of MARINE's neighbors might be suspicious of
him, and CORZO is urging MARINE to return to the MARINE RESIDENCE
to retrieve the cocaine CORZO left there.

         d.   On or about June 8, 2010, MARINE spoke with
one of his customers by phone.   The customer said to MARINE,
"Damn, answer the phone . . . a zero-four."   I believe, based on
my training and experience and my participation in this
investigation, that a "zero-four" means 40 grams of cocaine.
Moments later, MARINE called RODRIGUEZ and told RODRIGUEZ to
bring a "zero-four" to his customer.   Shortly thereafter, agents
conducting surveillance at the MARINE RESIDENCE observed
RODRIGUEZ depart the MARINE RESIDENCE and drive to a location
where agents believe, based on their investigation, the customer
of MARINE's referenced earlier in this subparagraph resides.   I
believe, based on my training and experience and my participation
in this investigation that RODRIGUEZ took cocaine stored at the
MARINE RESIDENCE from the MARINE RESIDENCE to deliver to MARINE's
customer.

e.    On or about July 11, 2010, at approximately

3:00 p.m., MARINE spoke with CORZO.  During this call, CORZO

asked MARINE, "Listen, what is wrong with you man?"  MARINE

responded, "Listen, I'll go by there tomorrow to talk to you in

person . . .  I'll go there for sure."  CORZO replied, "You are

hiding or what?  Don't hide, you hear."  MARINE answered, "No,

I'm not hiding . . .Is just that I want all of us to be careful.

I'll talk to you in person tomorrow."  And later in the call,

MARINE told CORZO, "Everything is alright, I'll speak to you

tomorrow . . .  We all have to be careful . . .  you know, if I'm

doing it its for a reason, you understand?"  Based on my training

and experience and knowledge of the investigation, I believe that

in this call MARINE is expressing concern about discussing

narcotics trafficking with CORZO over the phone because MARINE is

concerned about being detected by law enforcement.

18.    On or about August 30, 2010, MARINE was captured

on video surveillance exiting the MARINE RESIDENCE.

### Probable Cause to Search the PREMISES

19.    As set forth above, there is probable cause to

believe that the defendants use the PREMISES to store narcotics

proceeds and records relating to narcotics trafficking,

including, but not limited to books, records, ledgers, papers and

other documents reflecting information such as names, telephone

numbers, addresses and financial records of individuals involved

in trafficking in narcotics, books and records showing narcotics transactions, prices and/or quantities of narcotics purchased and/or sold and similar records.

20.   As set forth above, law enforcement agents including members of ICE and SCPD have conducted surveillance of several drug transactions taking place at, near or inside the PREMISES.  There is probable cause, therefore, to believe that the defendants use the PREMISES to keep drug proceeds and records related to narcotics trafficking.

21.   In addition, based on my training and experience, I have learned that drug traffickers often keep the drug ledgers, cash, financial records and the other items described in paragraph B above in areas over which they have exclusive control, such as their homes.  For these reasons and based on the evidence outlined above, there is probable cause to search the PREMISES for the items described above, including records of the defendants' involvement in drug trafficking and evidence regarding the identities of their co-conspirators.

22.   Based upon my training, experience, and participation in this and many other narcotics investigations, as well as my conversations with other agents and officers, I believe the following:

- 35 -

a.   Drug traffickers commonly use residences to receive and store narcotics.  Such residences often serve as a base of operation for a narcotics trafficking organization;

b.  Such residences frequently contain materials and records used in connection with the business of distributing and selling drugs, including accounting records, ledger books and sheets, notations, account balances, United States currency and closed containers securing such currency, money orders, cashier checks, records of the electronic transfer of funds, telephones, including cellular telephones, personal address books and telephone directories, Rolodex indices, personal data assistants ("PDAs"), Blackberries, Sidekicks and other PDA-type devices, photographs of associates and subjects, adding machines and adding machine tapes, calculators, cassettes, and tapes;

c.   Traffickers of narcotic drugs and other controlled substances frequently maintain large amounts of United States currency on hand in order to maintain and finance their ongoing business in controlled substances;

d.   Traffickers commonly keep paraphernalia for packaging and distributing controlled substances.

e.   Narcotics traffickers routinely keep closed containers inside of which they keep narcotics, narcotics paraphernalia, firearms, ammunition, books, records, and other documents containing the names, addresses and/or telephone

- 36 -

numbers of narcotics trafficking associates, and currency and/or other valuables used to purchase narcotics or which reflect the proceeds of narcotics sales. Such containers include safes, key-lock strong boxes, suitcases, hidden compartments, and other instruments, which are further secured by combination and/or key locks of various kinds.

23. Based on these facts, and on those set forth above, I believe that there is probable cause to believe that the PREMISES are also likely to contain items containing or reflecting evidence of the processing or counting of drug proceeds, including but not limited to money counting machines.

24. Based on my training, experience, participation in other investigations concerning narcotics trafficking, and extensive discussions with other law enforcement agents, I know that individuals who traffic narcotics routinely secrete and store books, records, documents, currency and other items of the sort described in the attached RIDERS (annexed collectively hereto as Exhibit I) in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items.

25. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that there is presently concealed in the PREMISES, fruits, evidence,

- 37 -

and instrumentalities of violations of federal law, including violations of Title 21, United States Code, Section 846, which evidence consists of the items set forth in the attached RIDERS.

26. In addition, I respectfully request that the search warrants permit law enforcement agents to execute and complete the search at any time in the day or night. These four requested search warrants, if authorized by the Court, will be executed simultaneously with the arrests of the 17 defendants, all of whom are believed to be in the New York area. When arresting such a large number of defendants in one general vicinity, it is necessary to seek to arrest as many defendants as possible simultaneously in order to limit flight risk and danger to law enforcement officers. Because agents intend to begin making arrests on Monday evening and continuing to make arrests early Tuesday morning, law enforcement agents seek to execute the search immediately following the arrests and it is requested that the searches be permitted to proceed in the evening and/or early morning hours.

27. In light of the confidential nature of the continuing investigation, the Government respectfully requests that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

WHEREFORE, your deponent further respectfully requests that a search warrant be issued for THE PREMISES KNOWN AND

DESCRIBED AS **(1)** 116 WEST SUFFOLK AVENUE, CENTRAL ISLIP, NEW YORK
("AUTO BODY SHOP"); **(2)** 100 MIDDLETON ROAD, APT #38, BOHEMIA, NEW
YORK ("SANDOVAL RESIDENCE"); **(3)** 295 BERGEN AVENUE, 2nd FLOOR,
WEST BABYLON, NEW YORK ("MORALES RESIDENCE"); **(4)** 16 MAPLE ROAD,
AMITYVILLE, NEW YORK ("MARINE RESIDENCE"); (collectively,
"PREMISES"), authorizing your deponent or any other law
enforcement agents working for or with ICE to search for: (1)
narcotics; (2) United States currency used to purchase narcotics
or representing proceeds from the sale of narcotics; (3) books,
records, ledgers, papers and other documents reflecting
information such as names, telephone numbers, addresses and
financial records of individuals involved in trafficking in
narcotics or electronic forms thereof; (4) shipping labels or
other mailing documentation or materials; (5) books and records
showing narcotics transactions, prices and/or quantities of
narcotics purchased and/or sold; (6) books and records showing
cash transactions or other evidence of narcotics trafficking,
including, but not limited to, financial records, including money
receipts, credit card receipts, bank records showing deposit,
withdrawals and/or payments made by check or cash; (7) cellular
telephones, pagers, telephone bills, pager bills and similar
records; (8) financial records pertaining to the proceeds of drug
trafficking, all of which constitute evidence, fruits and

instrumentalities of narcotics trafficking in violation of Title 21, United States Code, Sections 841(a) and 846.

Based on the nature of this application, I respectfully request that this affidavit and the accompanying search warrant be issued under seal until further order of this Court to prevent the destruction and/or concealment of evidence and/or the flight of the defendants.

ILIANA PAGAN
Special Agent
Immigration and Customs Enforcement

Sworn to before me this
_30_ day of August, 2010

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK